Madden, Judge,
delivered the opinion of the Court.
The plaintiff, a partnership engaged in the general construction business, on August 3, 1948, made a contract with the Government, which acted through the Federal Public Housing Authority, to construct a large number of dwelling units at Hiawatha, Utah. The construction was a war housing project to house coal miners employed by the United States Fuel Company, a private corporation. The contract price, as modified by change orders, was $314,205.36, and the plaintiff was paid this amount. The work was to be completed within ninety days after the .receipt of notice to proceed, which notice was given on August 17,1943. In fact the work was not completed until many months later, but no liquidated damages for delayed completion were assessed against the plaintiff, as it was given extensions of time adequate to account for the delay.
It cost the plaintiff $408,593.55 to perform the contract, and it seeks to recover its loss, plus a reasonable profit, on the ground that its loss resulted from breaches of contract by the Government. Most of its unanticipated costs, and therefore its losses, probably resulted from the fact that it did not get as far along with its work as it had expected to before the onset of winter weather which, in particulars recited in our findings, made construction difficult and expensive.
The land on which the houses were to be built belonged to the United States Fuel Company. It had, in former years, had one or more coal loading tipples on the land, and a great *217 deal of slack or waste coal was piled on the land at various places. The plaintiff’s contract provided tbat this coal would be removed by “others” and deposited in low places on the site where it would be covered with earth in the grading and leveling of the site. In fact the United States Fuel Company was the one which had agreed with the Government to remove the coal, as one of the considerations to induce the Government to build the houses for its miners. It had no equipment for removing the coal, and intended, if the project went through, to have some one else do it. After the plaintiff’s contract with the Government was made on August 3, the plaintiff agreed with the United States Fuel Company on August 6 that it would itself remove the coal, and be paid by the Fuel Company for the work on a cost plus basis. The plaintiff says that the delay in the removal of the coal delayed its grading work to such an extent that, as one of its partners testified, the delay on that account alone would have thrown its construction work into the winter weather. It denies that it made its agreement with the Fuel Company to remove the coal on August 6, and insists that it did not make it until August 24, when it was desperate to get the coal removed in order to get ahead with its grading. We have resolved this sharp conflict in the testimony against the plaintiff, because the Government’s witness Shields, apparently wholly disinterested, testified to the August 6 agreement, and his testimony was supported, not only by one other credible witness, but also by a memorandum which he made in due course at the time, and which cannot be explained upon any basis except that such an agreement was then made.
The plaintiff having agreed with the Fuel Company on August 6 to remove the coal, the Government is, of course, in no way responsible for any harm which its late removal may have caused the plaintiff. If the plaintiff did not, as it says, have sufficient equipment to both remove the coal and get its grading done in time to avoid winter construction, it should not have undertaken to do both. Having so undertaken, it had no one to blame but itself for any harmful delay which may have resulted from its late removal.
*218 The other alleged breach of contract of which the plaintiff complains has to do with the water supply at the project. The only available water supply was a three-inch line running-through the-project, and coming from a reservoir some distance above, which reservoir, also supplied the United States Fuel Company town of Hiawatha with water. Paragraph 14 of the specifications of the plaintiff’s contract, quoted in finding 3, provided that the plaintiff should provide and pay for, inter alia, water for the project. The instructions to bidders, which the plaintiff had in hand when it made its bid, advised bidders to visit the site and acquaint themselves with conditions before bidding, warning them that the failure to do so would not relieve a bidder from the obligations of his contract.
The contract drawings, which the plaintiff had in its possession when it made its bid, showed the three-inch line mentioned above, and noted that it had a pressure of 180 pounds. The plaintiff visited the site and talked with the United States Fuel Company’s Mining Superintendent. It learned that the water line and the water supply belonged to that company, and was told that it might use water for construction purposes without charge.
The contract required that earth in fills be compacted by rolling in layers not exceeding six inches, each layer to be sprinkled before rolling. On a project of this size, a considerable amount of water was needed, for this compacting of fills and for mixing cement and mortar. There was a shortage of water in the reservoir, in September and early October, so that water had to be used sparingly. On one occasion the Mining Superintendent found that a hose was left running open uselessly and he shut off the water supply for twenty-four hours. For about a week, water was shut off for parts of days. For a time, a valve was clogged in the line which prevented the water from coming down. When the trouble was discovered, it was fixed. From September 15 to October 15 there was only enough water to supply a %-inch hose.
The plaintiff asserts that the Government misrepresented, probably innocently, to it that there was sufficient water avail *219 able for the construction job, and that it is liable in damages because of the falsity of its representation, even if innocently made. We think this assertion is not well-founded. The contract required the plaintiff to find, its own water, and it, in fact, did so, by inquiring of the Fuel Company which owned the land and the water facilities. Although it asserts that it was told by the Mining Superintendent that there was plenty of water, we have not . so found. We. can think of no reason why, in that semi-arid country, the Mining Superintendent who had no interest in the contract, except the indirect interest of his employer in getting the houses built, would have made such a reckless prediction. ' And we see '.no reason why the plaintiff’s partners, who lived and worked in the same general area, would have relied upon the prediction if he had made it. We think that ■ the plaintiff relied upon the fact that there was a water line near at hand, and supposed that, in general it would satisfy its requirements.
The plaintiff asserts that, whether.or not the Government misrepresented the facts as to a supply of water, the inadequacy of the supply, which we have found, was an unforeseen condition which brought into play Article 4 of the contract, quoted in finding 3, and entitled the plaintiff to a compensating increase in the contract price. There might be merit in this contention, if we. could ascertain whether, and if so, to what extent, the shortage of water increased the plaintiff’s costs. The plaintiff began its work late in August. That left it a relatively short time to work before cold weather. The diversion of its machines to the removal of coal, rather than to grading the site, may have delayed it. It says it did delay it. It had shortages of labor, materials and equipment, and was delayed by these. Its working time before cold weather was so short that almost any delay at all might have been crucial. We do not find that the water problem was, to any ascertainable extent, the cause of the plaintiff’s delay and damage.
The plaintiff’s petition will be dismissed. It is.so ordered.
Howell, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.